UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CASE NO. 5:09-CV-00205-R

ROMONA POWELL                                                    PLAINTIFF

v.

CHEROKEE INSURANCE CO. and
DURAROCK REINSURANCE, LTD                                       DEFENDANTS

## MEMORANDUM OPINION

This matter is set for a jury trial on June 27, 2011.  In advance of the final pretrial

conference, Defendant Cherokee Insurance Company ("Cherokee") has moved for summary

judgment (DN 34).  Plaintiff has responded (DN 39), Cherokee has replied (DN 41), and

Plaintiff has filed a sur-reply (DN 47).  Defendant DuraRock Reinsurance Ltd. ("DuraRock") has

also moved for summary judgment (DN 40).  Plaintiff has responded (DN 46) and DuraRock has

replied (DN 52).  These motions are now ripe for adjudication.  For the reasons that follow, both

are GRANTED.

Also before the Court is Plaintiff's motion for partial summary judgment (DN 45).  As

Defendants' motions for summary judgment are granted, the Court does not address Plaintiff's

motion.

## BACKGROUND

This is a third-party bad faith claim under the insurance laws of Kentucky.  The parties in

this action are diverse and it is in this Court via Cherokee's timely removal from the McCracken

County Circuit Court.

The facts surrounding the matter are largely undisputed.  On November 27, 2004, outside

1

Paducah, Kentucky, Plaintiff Ramona Powell and Doid Young were involved in an automobile accident when the tractor-trailer truck Young was operating pinned Powell's automobile against a concrete barrier. The force of the impact spun Powell's vehicle and she ended facing oncoming traffic. Young apologized to Powell on the scene, claiming that when he changed lanes, he had not seen her because she had been in his blind spot. As a result of the collision, Young's automobile was damaged and she suffered a variety of physical injuries, the most severe to her neck.

At the time of the incident, Young was employed by Morristown Drivers Service, Inc. ("Morristown"), who in turn was insured by Cherokee. DuraRock provides reinsurance to Cherokee on a number of its policies, including Morristown's. Following the accident, Cherokee hired a local, independent adjuster, Denis Clement, to handle a portion of Powell's claim. Another adjuster, Christopher Henness, was also assigned to the matter in Cherokee's main office. It is unclear from the record exactly when Henness was assigned to the claim or the apportionment of responsibilities between himself and Clement. However the Court can be certain that Henness possessed the ultimate authority to decide when to settle Powell's claim and for how much. DN 39-3 at 11.

Within three weeks of the accident, December 14, 2004, Cherokee had paid Powell for her property damage. By February of 2005, Powell had hired attorney Gary Schaaf to represent her. Schaaf began his correspondence with Clement and Mike Moore, counsel for Young and Morristown. On February 28, 2005, Clement sent the first of what would be a number of letters requesting copies of the medical files and reports documenting Powell's injuries. DN 34-2 at 1. Similar letters from Clement followed, DN 34-2 at 2-5, with replies from Schaaf stating that

these items were forthcoming, as soon as Powell had reached "maximum medical improvement." DN 34-3 at 1-2. Schaaf further stated that he would forward the information when it became available, along with a settlement demand. DN 34-3 at 1-2; DN 39-2 at 4. This back and forth continued until September 18, 2006. DN 34-3 at 2.

Powell, through her counsel, filed suit in McCracken County Circuit Court against Morristown and Young on November 17, 2006 ("underlying lawsuit"). Cherokee's interrogatories were propounded on Powell on December 14, 2006, requesting a variety of information, including the names of medical providers, bills, tax returns, and other information relevant to Powell's alleged damages. On May 13, 2008, these interrogatories were returned completed. Interrogatory eleven (11) addressed Powell's itemized claim for damages and was answered as follows:

> 11. Pursuant to CR 8.01, stat[e] (sic) the amount for each item of damages you are claiming in itemized form and for each state, the basis for such amount, and the method of calculation of each amount.
>
> ANSWER: Answer: 1.) As far as past medical expenses, Plaintiff is asking for an amount to be determined by a jury which is fair and reasonable, not to exceed [$150,000.00] ($113,003.62 in medical bills at present time). Plaintiff is continuing to incur medical expenses as a result of this accident and her injuries.
>
> 2.) As far as future medical expenses, it is not known presently the amount which Plaintiff will need for future medical care as a result of injuries she suffered. As Defendant is requesting a number at the present time, however, Plaintiff will ask for an amount to be determined by a jury which is fair and reasonable, not expected to exceed [$200,000.00].
>
> 3.) As far as past pain, suffering, and inconvenience and loss of enjoyment of life to date of trial, Plaintiff believes that it is completely up to the jury to decide what amount to award. However, if Defendant is requesting the amount which Plaintiff may claim at trial for this damage element, Plaintiff will request an amount to be determined by a jury which is fair and reasonable not to exceed [$300,000.00].
>
> 4.) As far as future pain, suffering, and inconvenience and loss of enjoyment of life,

Plaintiff believes that it is completely up to the jury to decide what amount to award. However, if Defendant is requesting the amount which Plaintiff may claim at trial for this damage element, Plaintiff will request an amount to be determined by a jury which is fair and reasonable, not to exceed [$350,000.00].

5.) As far as permanent impairment of her power to labor and earn income/money, Plaintiff believes that it is completely up to the jury to decide what amount to award. However, if Defendant is requesting the amount which Plaintiff may claim at trial for this damage element, Plaintiff will request an amount to be determined by a jury which is fair and reasonable, not to exceed [$150,000.00].

6.) As far as past lost wages, fringe benefits and the like, Plaintiff is asking for an amount to be determined by a jury which is fair and reasonable, not to exceed [$40,000.00] ($25,272.00 in last wages at present time).

DN 34-8 at 7-8. In support of these demands, Powell produced over 1300 pages of medical reports, the majority of which detailed the injuries she sustained as a result of the accident. She also supplied Moore with medical releases for her past physicians. With her claims for lost wages and future impairment of income, the only pertinent evidence offered in support of these alleged damages was a W-2 from 2003 and the answer to another interrogatory where Powell claimed to have work as a personal assistant since 1998 at a salary of $156.00 per week. DN 34-8.

Following receipt of these documents, Moore sent a letter to Cherokee and Henness on June 25, 2008, laying out his proposed strategy for the case. DN 34-4. In it, Moore relayed that even though he had received Powell's interrogatory answers, he was still having problems tracking down Young and getting his side of the story. *Id*. Moore also said that Powell herself needed to be deposed. *Id*. Specifically he wrote that he "need[ed] to see and speak with the Plaintiff before [he could] get a feel for the value of the case." *Id*. By that year's end, the two parties had scheduled Powell's deposition for March 11, 2009. The deposition took place on that date.

On May 19, 2009, Schaaf sent Moore a letter indicating that "the time [was] ripe to either set this case for trial or settle it." DN 34-5 at 1. Contained within the letter was an offer to settle the matter for $475,000.00, which would stay open until June 19, 2009. On June 16, 2009, Moore and Schaaf spoke about the settlement offer over the telephone and both agreed to mediate the matter on September 16, 2009. According to Schaaf's personal notes, he told Moore during the conversation that while a response to this offer would be appreciated before mediation, it was not necessary. DN 34-6. In the mediation, the claim settled for $325,000.00.

This bad faith action followed on November 13, 2009. In Powell's complaint, she outlines Henness's and Moore's alleged blunders during the handling of her claim, noting that they refused to engage in timely settlement negotiations when Young's liability was never in question. DN 1-2 at 3-5. Powell also criticizes Cherokee's practices for the education, training, and evaluating of its adjusters. She declares that because Henness was an unlicensed, untrained insurance adjuster in Kentucky, unfamiliar with state law governing insurance settlements, and as Cherokee provided no written manual or guidelines to their adjusters, she was made to wait an unreasonable amount of time for a settlement that should have been issued quickly and efficiently. DN 39 at 4-6. Finally, Powell avers that the documents necessary for Cherokee to make a legitimate settlement offer were available shortly after she returned her interrogatories in May of 2008. Powell alleges that the sixteen-month period between the disclosures and settlement was entirely unreasonable and is demonstrative of the neglect she was forced to suffer despite Young's clear liability. *Id*. In support of her position, Powell has contracted an expert, Kevin Quinley, who offers an expert report recounting many of the above-stated accusations. DN 34-7.

**STANDARD**

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Mere speculation will not suffice to defeat a motion for summary judgment: "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

Finally, while Kentucky state law is applicable to this case pursuant to *Erie Railroad v. Tompkins*, 304 U.S. 64 (1938), a federal court in a diversity action applies the standards of Fed. R. Civ. P. 56, not "Kentucky's summary judgment standard as expressed in *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476 (Ky. 1991)." *Gafford v. Gen. Elec. Co.*, 997 F.2d

150, 165 (6th Cir. 1993).

## DISCUSSION

Kentucky's precedent on bad faith is well developed and an oft explored topic by the district courts sitting within its borders.[1]  Although these actions may be pursued under both the state's common law and the Unfair Claims Settlement Practices Act (UCSPA), *see* KRS § 304.12-230, "Kentucky law adheres to a single test applicable to all bad faith actions, whether brought by a first-party claimant or a third-party claimant, and whether premised upon common law or a statutory violation." *Cobb King v. Liberty Mut. Inc. Co.*, 54 F. App'x 833, 836 (6th Cir. 2003) (applying Kentucky law) (quotation marks omitted).  "Accordingly, the claims under the UCSPA and common law bad faith claims [may be] analyzed together."[2]  *Id.*

---

[1]Where jurisdiction is exercised on diversity of parties, the substantive law of Kentucky governs the dispute. *Rutherford v. Columbia Gas*, 575 F.3d 616, 623 (6th Cir. 2009).

[2] Under this statutory section, an insurer may engage in unfair claims settlement practice if the following occurs:

(2) Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies;

(3) Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies;

(4) Refusing to pay claims without conducting a reasonable investigation based upon all available information;
. . .
(6) Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear;

(7) Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds;
. . .
(12) Delaying the investigation or payment of claims by requiring an insured,

The Kentucky Supreme Court has set forth the following test to review claims of bad faith:

> [A]n insured must prove three elements in order to prevail against an insurance company for alleged refusal in bad faith to pay the insured's claim: (1) the insurer must be obligated to pay the claim under the terms of the policy; (2) the insurer must lack a reasonable basis in law or fact for denying the claim; and (3) it must be shown that the insurer either knew there was no reasonable basis for denying the claim or acted with reckless disregard for whether such a basis existed.

*Wittmer v. Jones*, 864 S.W.2d 885, 890 (Ky. 1993) (quoting *Curry v. Fireman's Fund Ins. Co.*, 784 S.W.2d 176, 178 (Ky. 1989) (dissent Leibson, J.)); *see Cowan v. Paul Revere Life Ins. Co.*, 30 F. App'x 384, 387 (6th Cir. 2002) (unpublished) (applying Kentucky law).  A claim of bad faith is only cognizable if the evidence is adequate to warrant punitive damages.  *United Services Auto. Ass'n v. Bult*, 183 S.W.3d 181, 186 (Ky. Ct. App. 2003) (citation omitted).  This entails that "the proof is sufficient for the jury to conclude that there was conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." *Wittmer*, 864 S.W.2d at 890 (citations and quotation marks omitted).  "Absent such evidence of egregious behavior, the tort claim predicated on bad faith may not proceed to a jury." *United Services*, 183 S.W.3d at 186.

With regard to the promptness of settlements, "mere delay in payment does not amount to

---

claimant, or the physician of either to submit a preliminary claim report and then requiring the subsequent submission of formal proof of loss forms, both of which submissions contain substantially the same information;

. . .

(14) Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement[.]

KRS § 304.12-230(2)-(14).  Powell claims violations of each of these provisions in her complaint. DN 1-2 at 4.

outrageous conduct absent some affirmative act of harassment or deception." *Motorists Mut. Ins. Co. v. Glass*, 996 S.W.2d 437, 452 (Ky. 1997). "There must be proof or evidence supporting a reasonable inference that the purpose of the delay was to extort a more favorable settlement or to deceive the insured with respect to the applicable coverage." *Id*. "Evidence of mere negligence or failure to pay a claim in timely fashion will not suffice to support a claim for bad faith. Inadvertence, sloppiness, or tardiness will not suffice; instead, the element of malice or flagrant malfeasance must be shown." *United Services*, 183 S.W.3d at 186.

## I. Cherokee's Motion for Summary Judgment

Cherokee makes a series of arguments in its motion as to why the present evidence fails to show an issue of material fact. All touch upon a central theme: that there is insufficient proof in the record to show that Cherokee acted with the egregious conduct necessary to maintain a claim of bad faith. Specifically, though Cherokee concedes that it did take roughly five years to settle Powell's claim, the first documentation that outlined her physical and economic damages was not disclosed until three years and six months after the accident, in the form of her interrogatory answers and accompanying medical files. Cherokee additionally states that even after it was in receipt of these answers, further investigation was justified to determine the legitimacy of her damage calculations. This necessitated Powell's deposition on March 11, 2009, and roughly six months from that date, the parties settled the action. Cherokee asserts that viewed through this lens, there can be no question that the litigation's time line was reasonable, albeit somewhat elongated.

Powell responds that the sheer duration of this claim and the inadequate training of Cherokee's personnel each creates a reasonable inference upon which a jury could base a finding

of bad faith. Furthermore, she appears to contend that the third prong of *Wittmer*'s bad faith test, whether the insurer acted with reckless disregard, is strictly a question for the jury. Powell also counters that testimony offered by expert Kevin Quinley sets forth a number of reasons why Cherkoee's procedures and practices are inadequate in their current form and therefore violative of the UCSPA.

In confronting Cherokee's motion for summary judgment, the Court will divide its analysis into the following subsections: (A) Powell's burden to survive a motion for summary judgment in bad faith litigation; (B) the impact of the relevant law on the facts at hand; (C) Kevin Quinley's expert testimony.

## A. Movant's and Non-Movant's Burdens in Bad Faith Litigation

To be sure, not only does Cherokee bear the burden in this motion to demonstrate that there are no issues of material facts that need be decided by a jury, Fed. R. Civ. P. 56(c), but all ambiguities and reasonable inferences must be drawn in Powell's favor. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. Still, the third and final prong of *Wittmer*'s bad faith test requires certain action by a plaintiff as well to survive a summary judgment motion.

In her response, Powell writes that "[a]n insurer's lack of good faith is a question of fact for the jury." DN 39 at 9. Such a statement is not entirely accurate. Issues of fact, like whether an insured engaged in bad faith are within the jury's province; still, they do not automatically proceed to trial once alleged. Rather, "[c]ourts have been clear that 'in order to survive a motion for summary judgment, a plaintiff in a bad faith action must come forward with evidence, sufficient to defeat a directed verdict at trial, which reveals some act of conscious wrongdoing or recklessness on the part of the insurer.'" *Winner v. State Farm Ins. Cos.*, No. 3:05-CV-143,

2006 WL 2792399, at *2 (W.D. Ky. 2006) (quoting *Matt v. Liberty Mut. Ins. Co.*, 798 F. Supp. 429, 434 (W.D. Ky. 1991), aff'd, 968 F.2d 1215 (6th Cir. 1992) (applying Kentucky law))); *see United Services*, 183 S.W.3d at 186 ("Absent such evidence of egregious behavior, the tort claim predicated on bad faith may not proceed to a jury."); *Motorists Mut. Ins.*, 996 S.W.2d at 452 (to survive a motion for summary judgment, "[t]here must be proof or evidence supporting a reasonable inference that the purpose of the delay was to extort a more favorable settlement or to deceive the insured with respect to the applicable coverage").

This precedent persuades the Court that to survive this motion for summary judgment and proceed to trial, Powell must put forth sufficient evidence to support a reasonable inference that Cherokee's behavior was so egregious that she is entitled to punitive damages. *See Wittmer*, 864 S.W.2d at 890; *United Services*, 183 S.W.3d at 186.

### B. Impact of Kentucky's Bad Faith Law on the Relevant Facts

While Cherokee does not concede that its actions in handling this claim satisfy the first two factors in *Wittmer*'s test, nor has it provided an argument that would persuade the Court that there are no material facts that could convince a jury to find in Powell's favor at trial. Instead, Cherokee makes it stand with the last prong: "that the insurer either knew there was no reasonable basis for denying the claim or acted with reckless disregard for whether such a basis existed." *Wittmer*, 864 S.W.2d at 890. Cherokee concentrates its efforts on two rough premises, addressed in turn below: that the litigation's overall progression reveals that its behavior was more than reasonable, and that even if there was some delay, there is no evidence that Cherokee acted with the intentional or premeditated behavior necessary to satisfy *Wittmer*'s final prong.

With regard to the underlying litigation's time line, the facts show that the appropriate

moment to begin measuring any potential delay by Cherokee is May 13, 2008, the date Powell

returned the interrogatories propounded upon her.[3]  While her objections to the length of the

underlying lawsuit are understandable, Cherokee cannot be held to task for failing to settle

before it was in possession these answers.  That these interrogatories were originally conveyed in

December of 2006 substantially undermines Powell's claims in her motion that Cherokee and its

staff were delinquent in their responsibilities during this time period.  By sending the

interrogatories, Cherokee was implicitly signaling that it needed information to determine the

extent of Powell's injuries.  Instead of a prompt response to the discovery request, Powell

allowed a year and half to pass before providing answers.  Thus, Powell seems to be throwing

stones in a glass house when she levels her finger at Cherokee and shouts "inaction."[4]

What is more, even accepting Powell's allegations that Cherokee should have offered

---

[3] It is important to also remember that in advance of Powell filing suit in November of 2006, Clement had written Schaaf on several different occasions asking for his client's medical records.  DN 34-2 at 1-5.  Schaaf and Powell did not abide by these requests however, waiting to release the records until May of 2008.  Such evidence directly contradicts Powell's contentions that during this period Cherokee and its agents were neglecting her claim.

[4] Powell's own expert offers the following testimony about this period:

Question by counsel for Cherokee: . . . Was there any way for the insurer to evaluate the claim without obtaining the information requested in those interrogatories and request for production of documents? . . . To fully evaluate the claim?
Answer by Kevin Quinley: Well, I don't know about fully evaluate.  I think they had enough information to evaluate liability as reasonably clear.  I think they had - - were receiving medical information from collateral sources as to the accumulation of medical expenses and nature and extent of injury.
    So they weren't totally in the dark.  I think they had information coming in that would help them evaluate it.  In terms of totally evaluating, well, I don't know.
Q: They couldn't fully evaluate the damages without the information, could they?
A: It would certainly help.

DN 34-9 at 24.

some sort of settlement from the moment the underlying suit was filed until May 13, 2008, she has not shown any indication that Cherokee was motivated by some malevolent animus when it did not extend a settlement offer during this period. To succeed, Powell must provide a reasonable inference that Cherokee purposefully drug its feet to compel a more favorable settlement or to deceive her. *Motorists Mut. Ins.*, 996 S.W.2d at 452. There is no evidence in the record that Cherokee harbored these intentions during this period; instead, it would appear that no settlement offer emerged during this stretch because Cherokee was waiting for Powell to provide it more information. DN 34-4. Powell may be correct that liability for this action was never truly in doubt, yet the severity of her injuries from the accident seems to have been a complete mystery to Cherokee up until it received her answers in May of 2008.[5] No precedent has been offered by Powell that under Kentucky law it is incumbent upon a third-party insurer to make a settlement offer even though it is ignorant about damages the claimant has suffered.[6] It was Powell's delay, not Cherokee's, that stalled the proceeding until the middle of 2008. Finding that Cherokee's decision to wait for the interrogatory answers was not outrageous, unreasonable, or part of a larger dilatory scheme, the Court's bad faith analysis must begin on

---

[5] With regard to at least two of Powell's claims, her lost wages and future impairment of earning, it is relatively clear that the damages cited in answers to Cherokee's interrogatories were almost entirely speculative. *See* Section B *infra*.

[6] Although Powell may point to subsection (6) of the UCSPA as Kentucky law contradicting this statement, she would be incorrect. *See* KRS § 304.12-230(6) (insurer may engage in unfair claims settlement where it fails to "attempt[] in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear"). Here, Cherokee did attempt to make a prompt and equitable settlement by propounding discovery requests on Powell in an attempt to learn about her claim. Indeed, it wasted no time in starting its investigation, sending the interrogatories less than a month after the complaint's filing.

May 13, 2008.[7]

From the time Moore received Powell's answers to the date a settlement was reached, sixteen months elapsed. For this period, Cherokee's summary judgment motion centers on its need for Powell's deposition. It declares that as her damage claims exceeded $1,200,000.00, and because a sizeable slice of that number was speculative or unsupported by documentary evidence, the delay suffered in waiting for her deposition was reasonable. Powell retorts that after the disclosures of May 13, 2008, Cherokee possessed all the necessary information to construct and relay a settlement offer. She says that since an offer did not immediately follow, Cherokee violated its duties under the UCSPA and Kentucky's common law of bad faith.

The Court rejects the arguments in Powell's response. First, it agrees with Cherokee's position that taking her deposition was the next logical step in this process, in that it offered the opportunity to confirm her alleged damages. Ignoring whatever issues were raised by Powell's claims for her present and future medical expenses, she provided in the interrogatory answers that she had was entitled to $190,000.00 for lost wages and future impairment of income. DN 34-8 at 8. The only evidence that she attached to these responses to support such assertions was one W-2 from 2003. In describing these claims, Powell's own expert offered the following deposition testimony:

---

[7] To find otherwise would lead to a nonsensical result. It would allow insureds to sit on their hands rather than answering discovery requests, while at the same time requiring insurance companies to pull settlement figures out of the air to avoid the risk bad-faith litigation. Both Kentucky and federal courts have recognized that "discovery is a two-way street." *See e.g.*, *Riggs v. Schroering*, 822 S.W.2d 414, 415 (Ky. 1991); *Montecatini Edison, S. p. A. v. Rexall Drug & Chemical Co.*, 288 F. Supp. 486, 489 (D. Del. 1968). Was Powell truly concerned about a quick settlement, she could have responded to the discovery requests with more haste to move the process along. That she chose not to belies her contention that Cherokee acted with malicious intentions during this period.

> Question by counsel for Cherokee: Has [Powell] been specific in the amount of damages that she has incurred with any of the other areas of damages besides past medical expenses?
>
> Answer by Kevin Quinley: I believe she's been as specific as she could be in that situation.
>
> Q: Does a settlement demand usually include documentation to support the amount requested?
>
> A: Usually, but not always.
>
> Q: . . . Without supporting documentation is there any way for an insurance company to evaluate a request for damages?
>
> A: I think generally an insurance company would need supporting documentation.
> . . .
> Q: When does an insurer have a duty to pay a claim?
>
> A: I think, speaking in general terms, when liability is reasonably clear and damages related to the accident in question are reasonably known.
> . . .
> Q: Was there enough information for the insurance company to evaluate what the permanent impairment or the power to earn money in the future would have been in May of 2008?
>
> A: To the penny, no, but I think that they had medical information indicating that this was an ongoing problem even if they were not able to quantify it to an exact penny amount.
>
> Q: Was there enough information to determine how long [Powell] was going to be off work at that time in May of 2008?
>
> A: Again, I think they had enough information to reasonably conclude that she was going to be off of work. But in terms of the exact number of days, the exact number of wages to the penny? No.
>
> Q: Did they know how many years she was going to be off work?
>
> A: I don't think either she or they at that point knew.

DN 34-9 at 12, 16. Quinley does continue, saying that Powell was still required to attempt to settle the matter. Nevertheless, his testimony underlines a fact about which there is no dispute: several of the damages claims espoused in the interrogatory responses were supported by scant or no documentary evidence. With such a finding, the Court believes it altogether reasonable that Cherokee would want to depose Powell to test the mettle of her injuries before making an offer to settle the matter as well as explore her claims for past and future lost wages for which there was little documentation. Moreover, the Court disagrees with the implications of Powell's

response and Quinley's testimony that because $190,000.00 represents only a fraction of her overall alleged damages, the dearth of evidence supporting these claims should not have forestalled a settlement offer. Such a figure is not a trivial amount, and Cherokee was well within its rights as an insurer to further investigate the matter.[8]

Next, Powell's declarations that Cherokee was required to make a timely settlement offer shortly after May of 2008 ignores that it had right to deny payment until there was sufficient evidence documenting proof of loss. In *Wittmer v. Jones*, the state supreme court described when an insurer was within its rights to investigate a claim and the proof of loss offered by a claimant:

> Although an insurer is under a duty to promptly investigate and pay claims where it has no reasonable grounds to resist in good faith, neither this duty nor any provision of the UCSPA requires the insurer to assume responsibility to investigate the amount of the claimant's loss for the claimant. The insurer['s] . . . legal responsibility is limited to payment upon proof of loss.

864 S.W.2d at 892. There the court went on to describe how the only evidence of loss provided to the claims adjustor was a letter by the claimant's counsel that "provided neither supporting documents nor reference to reliable sources." *Id*. Kentucky's highest court relied in part on this lack of proof when deciding that the insurer's failure to settle the claim quickly was not in bad faith. *Id*. Here, it is beyond reproach that by May of 2008, Powell had failed to offer sufficient

---

[8] Cherokee also raise issue in its motion with Powell's estimations of her past medical expenses and her future medical expenses. Though it would appear understandable that Cherokee would want to inquire as to these damages as well, the Court chooses not to examine these arguments because it does not have the specific materials disclosed in May of 2009 with regard to these damages before it.

evidence to support at least two of her claims: lost income and future impairment of income.[9] With legitimate doubts about a sizeable portion of the damages requested, the Court cannot fault Cherokee's desire to first depose Powell before attempting to settle the matter.

Accepting these two findings, the Court believes that the delay from May 13, 2008 to March 11, 2009, was reasonable when considering Cherokee's need for Powell's deposition. From this latter date until the mediation on September 16, 2009, the only event of significance that occurred was a discussion between Schaaf and Moore about the appropriate path to take toward resolution. In Schaaf's letter of May 19, 2009, he wrote that "the time [was] ripe to either set this case for trial or settle it." DN 34-5 at 1. Although the letter contained a settlement offer of $475,000.00, Schaaf said that he needed a reply in thirty days. *Id*. Before this time period elapsed, the parties spoke by telephone and agreed to the aforementioned mediation. Most important however are Schaaf's own notes about the June 16 conversation between himself and Moore. There he wrote that he would appreciate a response to his prior settlement offer, but it was unnecessary prior to mediation. DN 34-6. With this background, it is impossible to characterize Cherokee's behavior between March of 2009 and the mediation as unreasonable, much less taken in bad faith. Cherokee responded to Schaaf's letter within the time frame that he had set forth, both parties were amenable to mediation, and Cherokee's choice to forgo responding to the settlement offer before mediation was expressly condoned by Schaaf's own instructions. The conclusion that follows this factual recitation is simple: the delay from March of 2009 to the medication six months later was proper in light of the circumstances of this

---

[9] Again, the Court does not address the dispute over whether there was adequate proof to support her other estimations of future and past medical expenses.

litigation.

Finally, even if this Court ignores the time line set forth above and the reasonable delays between May 13, 2008 and September 16, 2009, Powell's response is misguided because she has failed to offer any evidence, direct or circumstantial, that Cherokee obstructed or obfuscated the process to extort or deceive her. *See Motorists Mut. Ins. Co.,* 996 S.W.2d at 452. In support of her contentions, Powell cites the precedent by the Sixth Circuit which would permit a jury to infer bad faith from Cherokee's inaction and its poor internal management processes. *See Estate of Riddle v. Southern Farm Bureau Life Ins. Co.*, 421 F.3d 400, 408 (6th Cir. 2005). However, the bases she offers for this inference are the length of time it took to reach a settlement and the "unprofessional" settlement practices of Cherokee. These are insufficient for a bad faith claim, as delays due to negligence or sloppiness are not per se egregious under Kentucky law. In addition, while Powell makes considerable arguments about whether Cherokee violated its duties in not settling the claim in a timely manner, this is not the appropriate analysis for the Court. Instead, she must show at least a modicum of evidence or the reasonable inference of unsavory motives in conjunction with the passage of time to survive summary judgment.[10] *United Services*, 183 S.W.3d at 186. As she has failed in this endeavor, this motion is well taken.

While no direct evidence can be found to support Powell's assertions, there are several pillars that support the propositions that Cherokee offers. Letters by Clement to Schaaf prior to the litigation indicate that Cherokee's agents were diligently trying to gather information on the matter. DN 34-2 at 1-5. The interrogatories propounded upon Powell not even a month after the

---

[10] Powell does provided certain conclusions by Quinley that ostensibly preclude the granting of summary judgment. DN 39 at 12-15. This is discussed in the section below.

underlying action commenced show that Cherokee was not sitting idly by in the face of Powell's claim. Equally important, the letter of June 25, 2008, from Moore to Henness provides a clear explanation why there was a delay from the receipt of Powell's answers to the final settlement; in it, Moore writes unambiguously that he needed to "see and speak with the Plaintiff before [he could] get a feel for the value of the case." DN 34-4. While Powell presents conjecture and speculation that the delays were driven by nefarious and ulterior motives, all of this evidence stands in stark contrast to these contentions. The Court refuses to cast aside the only reasonable conclusion from the evidence: Cherokee behavior was that of a normal insurer seeking to gather information on a claim before tying to resolve it.

In reaching the above decision, the Court is also able to rely upon the Sixth Circuit's opinion in *Naugle v. Allstate Insur. Co.*, 72 F. App'x 307 (6th Cir. 2003). There, the plaintiff was involved in an automobile accident in January of 1996. *Id*. at 308. She filed suit in January of 1998 seeking damages for her injuries. *Id*. at 309. In September of the same year, the plaintiff's counsel made his first settlement proposal, to which the defendant-insurer countered in December. *Id*. The matter was settled in February of 1999. *Id*. In the subsequent bad faith litigation, the district court applying Kentucky law granted summary judgment, finding no issue of material fact with regard to *Wittmer*'s third prong. The decision by the Sixth Circuit to affirm the ruling relied upon the following facts: (1) even if the claim had taken 35 months to settle, the plaintiff's counsel had failed to submit a settlement proposal for nearly two years after the accident; (2) the insurer was not obligated to initiate settlement discussions with the plaintiff, only respond reasonably to the plaintiff's demands; (3) the insurer did not attempt to settle the claim for an unreasonable amount; and (4) there was no evidence the insurer had used the delay

to gain some advantage over the plaintiff or misrepresented questions about the coverage. *Id*. at 309-10.

In reviewing the longevity of the instant action, the Court is able to draw similar conclusions as the ones reached in *Naugle*. Much of the delay in this action was the result of inactivity on Powell's part. A number of her vague and unsupported damages calculations in the interrogatory responses merited further examination by Cherokee, and thus the deposition was reasonable.[11] The parties spoke after the demand of May 2009 and scheduled mediation for several months later, where the matter was resolved. Lastly, there is no evidence whatsoever that Cherokee leveraged the delay to its advantage or was less than candid with Powell regarding any coverage issues. For all of these reasons, the Court finds that this motion is proper.

### C. Expert Kevin Quinley's Testimony

Powell has retained expert Kevin Quinley to help her demonstrate that Cherokee's actions satisfy the bad faith standard. With this motion for summary judgment, the parties have submitted his expert report (the "Report") and his deposition testimony. DN 34-7; DN 34-9. The Court has carefully reviewed both.

The Report generally details a number of issues with the way Cherokee handles claims. They include, among others, the improper training of its adjusters, the failure to propose a settlement figure until the mediation in September of 2009, and the failure to actively pursue a quick and fair resolution to Powell's claim. *See* DN 34-7. On the final page of the Report,

---

[11] Quinley's expert report and deposition discuss whether the responses to interrogatories in May of 2008 might be termed a "demand" to which Cherokee was required to respond. Without casting judgment on such an issue, the Court believes that the litigation's progression to Powell's deposition was reasonable and that the delay attributed to such action was not pursued by Cherokee as a result of some malevolent motive.

Quinley sets out the following conclusions:

> [1] The Powell claim does not reflect that [Cherokee] adopted and implemented reasonable standards for the [sic] prompt claim investigations.
> [2] [Cherokee] did not attempt to effectuate a prompt, fair, and equitable settlement of [Powell]'s bodily injury claim, a claim for which it should have recognized that liability had become reasonably clear.
> [3] [Cherokee] failed to promptly provide a reasonable explanation for not paying [Powell]'s bodily injury claim or for not making a compromise settlement offer on that claim before the September 2009 mediation.
> [4] [Cherokee]'s adjuster reward and evaluation systems do not reflect a commitment to good faith claims training and handling.

DN 34-7 at 19. Quinley's deposition roughly tracks these conclusions, expanding upon his

rationale and methods. When questioned if Cherokee's behavior was reckless or egregious,

Quinley offered the following:

> Question by counsel for Cherokee: Did you review any behavior by any representative of [Cherokee] that you would consider to be reckless indifference to [Powell]'s rights?
> Answer by Kevin Quinley: I haven't - - I don't recall . . . .
> . . .
> Q: Did you review any evidence to suggest that a representative of [Cherokee] acted with an evil motive, that they intended to do harm to [Powell]?
> A: Again, that's - - that's not part of my opinion . . . .
> . . .
> Q: Did you see anything that indicated to you that [Cherokee] intended to do harm to [Powell] - - they had an evil motive, they meant to drag this claim out?
> A: Well, I don't use the words, but I think they did drag this claim out. Whether it was because of part of some, you know, premeditated grand scheme, that's not part of my opinion . . . .

DN 34-9 at 31.

The submission of an expert report or the offered deposition of an expert will not

necessarily defeat a motion for summary judgment. *See Williams v. Ford Motor Co.*, 187 F.3d

533, 543 (6th Cir. 1999); *Kosierowski v. Allstate Ins. Co.*, 51 F. Supp. 2d 583, 595 (E.D. Pa.

1999). "Although expert testimony may be more inferential than that of fact witnesses, in order

to defeat a motion for summary judgment an expert opinion must be more than a conclusory assertion about ultimate legal issues." *Williams*, 187 F.3d at 543 (quoting *Hayes v. Douglas Dynamics, Inc.*, 8 F.3d 88, 92 (1st Cir. 1993)).

Quinley's Report and deposition testimony cannot change the immutable finding of this Court when it reviews the offered proof in the light most favorable to Powell: there is no evidence that "reveals some act of conscious wrongdoing or recklessness on the part of the insurer." *Winner*, 2006 WL 2792399, at *2 (citation omitted). It is true that Quinley's Report and testimony both underline places where Cherokee can improve its claims process and indicate that Cherokee may have been "passive" in its adjudication of her claim; they however fall short of providing a foundation upon which a jury could premise a finding that Cherokee acted with conscious indifference or to harass and deceive Powell during her claim. *Motorists Mut. Ins. Co.*, 996 S.W.2d at 452. Even accepting that Quinely may have provided evidence sufficient to show violations of certain provisions of the UCSPA, claims under this statute may only be maintained if they also establish *Wittmer*'s common law standard. *Cobb King*, 54 F. App'x at 836 (applying Kentucky law). As such, violations of the provisions under KRS 304.12-280 are not enough to prevail over a Rule 56 motion. Lastly, a number of other courts applying Kentucky's bad faith law have seen fit to grant summary judgment or directed verdict motions notwithstanding the presence of expert testimony supporting the plaintiff's case. *See e.g.*, *Scott v. Deerbrook Ins. Co.*, 714 F. Supp. 2d 670, 680-81 (E.D. Ky. 2010) (granting summary judgment where expert witness's opinion was not supported by sufficient facts in the record); *United Services*, 183 S.W.3d at 186 (reversing trial court's denial of the defendant's motion for directed verdict even when a bad faith claim supported by four expert witnesses).

Ultimately, nothing offered in Quinely's Report or deposition would be helpful for the jury in deciding the third prong of *Wittmer*. As a result, his involvement is inadequate to defeat this motion.

D. Conclusion as to Cherokee

On the whole, there is no evidence in the record upon which a jury could premise a finding that Cherokee engaged in outrageous or egregious behavior. Though the delays Powell endured in waiting for the settlement were unfortunate, many were due in large part to her own inaction, with others premised on Cherokee's understandable desire for more information about her injuries. Even considering that Quinley's testimony spotlights a number of problems in the handling of this particular claim, not once does he offer testimony or an opinion that would aid the jury in finding that Cherokee's behavior rose to the level necessary to defeat a motion for summary judgment under *Wittmer*'s standard. For all of these reasons, the Court GRANTS Cherokee's motion.

**II. DuraRock's Motion for Summary Judgment**

DuraRock provides reinsurance to Cherokee on a number of its policies. Under Morristown's policy, DuraRock provided excess/umbrella liability coverage up to $2,000,000.00 per occurrence.[12] DN 46-1. The obligations of DuraRock are set out in the reinsurance agreement ("Agreement") DN 46-2. The provisions of the Agreement indicate that DuraRock was bound to both reimburse Cherokee for whatever losses they sustained that implicated the excess or umbrella coverage and for the loss settlements that Cherokee negotiated with its insureds. *Id*. at 1-3. The Agreement contains no provisions regarding DuraRock's right to

_____

[12] Cherokee was responsible for coverage up to $250,000.00.

participate in the claims process; it is however afforded the opportunity to defend a claim or suit at its own expense. *Id*. at 3.

DuraRock avers that its summary judgment motion is appropriate since it was not actively involved in Cherokee's claims process and no evidence has been offered by Powell indicating otherwise. The company's president has attached an affidavit to that effect and he has affirmed that the matter was strictly under the supervision of Cherokee's personnel. DN 40-2 at 1. In addition, DuraRock alleges that the deposition testimony taken in advance of trial is altogether absent of evidence that would indicate that it engaged in the egregious behavior required for a bad faith claim.

Powell's objections to these characterizations in her response are without merit. Ignoring momentarily the question of what exactly DuraRock contractual duties were to see the matter settled, the Court has been unable to locate a scintilla of evidence that DuraRock's behavior during this process would make it liable for punitive damages. So far as the Court can discern, the extent of Powell's current bad faith allegations against DuraRock are limited to the unreasonable time that it took for a settlement to be reached. As with Cherokee, there is no proof that DuraRock delayed the matter to receive "a more favorable settlement or to deceive the insured with respect to the applicable coverage." *Motorists Mut. Ins. Co.,* 996 S.W.2d at 452. Powell's allusions to past precedent that would allow the jury to infer bad faith are unavailing as the case she relies upon, *Estate of Riddle v. Southern Farm Bureau Life Ins. Co.*, concerns markedly different facts where the insurer's behavior allowed for such reasonable inferences. 421 F.3d at 408-09 (judgment as a matter of law was not proper in bad faith action on first-party insurance claim where in the denial of claim, the insurer went through the claimant's file with a

"fine-tooth comb" looking for reasons to deny claim).

Simply stated, Powell has failed to put forth enough proof of DuraRock's malevolent behavior to defeat this motion. In the record, she has not offered any evidence that DuraRock was involved in processing her claim or that its general policies and procedures for reviewing, investigating, processing claims are inappropriate.[13] Powell has declined to depose DuraRock officials, solicit testimony from Quinely on DuraRock's role in settling the claim, and question Cherokee's personnel on their affiliation with DuraRock. In fact, the only parts of the record that implicate DuraRock's activity in any way are the conclusory statements in Powell's complaint, and her response to this motion. For such a high evidentiary threshold, the paucity of affirmative evidence is an improper foundation to sustain Powell's objections to this motion.[14] For these reasons, the Court will also GRANT DuraRock's motion for summary judgment.

### III. Powell's Motion for Partial Summary Judgment

Powell has also made a motion for partial summary judgment. She moves for it on the basis of the first two factors in *Wittmer*: "(1) [the obligation of the insurer] to pay the claim under the terms of the policy [and] (2) [the lack of a reasonable basis for the insurer] to pay the claim under the terms of the policy." *Wittmer*, 864 S.W.2d at 890 (citation omitted). She argues,

---

[13] Once again, the Court addresses these issues ignoring DuraRock's assurances that it does not evaluate claims of this nature.

[14] In its motion, DuraRock avers that the only duty it owed was to Cherokee and not Powell; therefore, it cannot be implicated in the tort of bad faith or under the UCSPA. Whether a company that offers reinsurance may be liable under a bad faith action in these precise circumstances seems to be yet unanswered by Kentucky courts. Certainly, there are real questions whether DuraRock even had the authority to interject itself into the claims decisions process under the Agreement. Still, rather than intrude on a matter of state law, the Court is satisfied to grant summary judgment on the sheer lack of evidence that Powell has provided. Thus, these alternative grounds for summary judgment are not addressed.

incorrectly, that under the present circumstances the third and final factor is an issue for the jury.

For all of the reasons discussed in the earlier sections, Powell's motion for summary judgment is denied. Admittedly, her claim with Cherokee did take a lengthy period of time, but Kentucky law indicates that the passage of time alone is an insufficient basis to allow a bad faith claim to proceed to a jury. Powell has omitted "proof or evidence supporting a reasonable inference that the purpose of the delay was to extort a more favorable settlement or to deceive the insured with respect to the applicable coverage." *Motorists Mut. Ins. Co.*, 996 S.W.2d at 452. Consequently, her motion for summary judgment is inapposite.

## CONCLUSION

For the aforementioned reasons, Defendants' motions for summary judgment (DN 34; DN 40) are hereby GRANTED. Plaintiff's motion for partial summary judgment (DN 45) is DENIED. An appropriate order shall issue.