UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:09-CV-00205

RAMONA POWELL                                                        Plaintiff

v.

CHEROKEE INSURANCE COMPANY                                          Defendant

## MEMORANDUM OPINION

This matter is before the Court upon Defendant Cherokee Insurance Company's (Cherokee) "Supplemental Brief in Support of Summary Judgment." (Docket No. 99.) In its previous Memorandum Opinion and contemporaneous Order entered on June 1, 2011, the Court granted summary judgment in favor of Defendants Cherokee and Durarock Reinsurance, Ltd.[1] (Docket Nos. 83; 84.) Plaintiff Ramona Powell moved the Court to reconsider that ruling, and the Court subsequently denied her motion in a written Order entered December 2, 2011. (Docket No. 91.) Powell then appealed. (*See* Docket No. 92.) But after the parties had fully briefed the issues on appeal, the Sixth Circuit decided *Phelps v. State Farm Mutual Auto. Ins. Co.*, 680 F.3d 725 (6th Cir.) (2-1 decision), *rehearing and rehearing en banc denied*, (2012). Finding *Phelps* may be instructive, the Sixth Circuit vacated this Court's prior judgment and remanded this action for reconsideration in light of *Phelps*. (*See* Docket Nos. 95; 96.) The Court accordingly ordered the parties to brief their respective arguments in light of *Phelps* to

---

[1] Plaintiff has since agreed to dismiss Durarock Reinsurance, Ltd., with prejudice; thus Durarock is no longer a party to this action. (Docket No. 101.)

assist its reconsideration. (Docket No. 97.) Cherokee then filed the instant "Supplemental Brief in Support of Summary Judgment," to which Powell responded, (Docket No. 102), and Cherokee then replied, (Docket No. 103). Fully briefed, this matter is now ripe for reconsideration. For the reasons that follow, the Court again will GRANT Cherokee summary judgment.

## BACKGROUND

The facts surrounding this matter are largely undisputed and are set forth more fully in the Court's prior Memorandum Opinion at Docket No. 83. Still, a brief recitation of the pertinent facts is in order.

This is a third-party bad faith claim brought under the Kentucky Unfair Claims Settlement Practices Act (UCSPA), Ky. Rev. Stat. § 304.12-230. Underlying this case is an automobile accident between Powell and Doid Young on November 27, 2004. At the time of the accident, Young was employed by Morristown Drivers Services, Inc. (Morristown), which was insured by Cherokee. After the accident, Cherokee hired a local, independent claims adjuster, Denis Clement, to handle a portion of Powell's claim. Christopher Henness, another adjuster, was also assigned to her claim.

Cherokee paid Powell's property damage claim within three weeks of the accident. By February 2005, Powell had hired attorney Gary Schaaf, who had begun corresponding with Clement and attorney Mike Moore, counsel for Morristown and Young. On February 28, 2005, Clement sent the first of several letters requesting copies of the medical files and reports documenting Powell's injuries. Schaaf responded that these items would be forthcoming once Powell reached "maximum medical

improvement," and stated he would forward the requested information to Cherokee when it became available along with a settlement demand. (Docket No. 34-3; *see also* Docket No. 39-2.) Between then and September 18, 2006, back-and-forth correspondence continued between Clement and Schaaf, during which Powell provided minimal information on her injuries. (*See* Docket No. 34-3, at 2.)

On November 17, 2006, Powell filed suit against Morristown and Young. Cherokee propounded its first set of interrogatories on Powell on December 14, 2006, requesting a variety of information, including the names of medical providers, medical bills, tax returns, and other information pertaining to Powell's alleged damages. Powell did not answer these interrogatories until May 2008, some seventeen months later. Her completed interrogatories alleged damages exceeding $1,200,000. As the Court previously noted, although Powell claimed $190,000 in lost wages and future impairment of income, the only evidence offered in support of this claim was a sole W-2 from 2003,[2] Powell's own assertion that her weekly salary was $156 per week, and notes from doctors that she temporarily could not work. At that time, Powell also supplied over 1300 pages of medical reports, which primarily detailed the injuries she sustained from the accident.

After receiving Powell's responses, correspondence between attorney Moore and Cherokee reflects Moore's position that Powell needed to be deposed to better

---

[2] Powell stated in her answers to interrogatories that she was in possession of no other tax records but would be willing to execute an authorization for Cherokee to obtain those records. (*See* Docket No. 34-8, at 15-16.) However, Powell flatly refused to execute the requested authorization for employment information. (Docket No. 34-8, at 16-17.)

assess her damages claim, specifically writing he "need[ed] to see and speak with the Plaintiff before [he could] get a feel for the value of the case."  (Docket No. 34-4.)  Moore's correspondence also reflects difficulties with tracking down and obtaining information from Young, the other driver.  (*See* Docket No. 34-4.)  According to the "Hot Print" case notes kept by attorney Schaaf, he and Moore were in contact throughout the remainder of 2008 on a regular, if not weekly, basis.  (*See* Docket No. 99-1, at 1-4.)  Schaaf's notes reflect that as of June 2008, Moore wanted to take Powell's deposition, "but is not in a position to aske [sic] [to take her deposition] yet," because he could not locate Young and reciprocate on Schaaf's desire to depose Young.  (Docket No. 99-1, at 2.)  Schaaf's notes then show one month later that Moore had "located and obtained answers from Doid Young and is in the process of getting those to us."  (Docket No. 99-1, at 2.)  And as of August 11, 2008, Schaaf's notes indicate that he and Moore had begun discussing dates to depose Powell.  (Docket No. 99-1, at 2.)  This back and forth continued through February 2009 with Schaaf and Moore working to schedule Powell's deposition, which eventually took place on March 11, 2009.  (*See* Docket No. 99-1, at 2-6.)

Powell thereafter tendered her first settlement offer to Moore on May 19, 2009, stating "the time is ripe to either set this for trial or settle it."  (Docket No. 34-5.)  In her May 19 letter, Powell offered to settle her claim for $475,000, advising that the offer would remain open through June 19, 2009.  (Docket No. 34-5.)  Schaaf next spoke to Moore on or about June 15.[3]  (Docket No. 34-6.)  According to his notes, Schaaf was

---

[3] Schaaf's notes for June 16, 2009, say he actually spoke to Moore "on May 15, 2009"; however, given the context, "May" appears to be a typo.  (*See* Docket No. 34-6.)

agreeable to mediation and told Moore: "[I]t might be beneficial to receive a good faith offer sometime [before] the mediation. I told him it is not necessary, but is sometimes helpful." (Docket No. 34-6.) Mediation was scheduled for September 16, 2009, and the claim settled at that time for $325,000.

This bad faith claim followed on November 13, 2009. In essence, Powell alleges Cherokee's refusal to settle after she returned the interrogatories in May 2008 constituted bad faith because Cherokee possessed the necessary information at that time to evaluate her claim. Specifically, she posits that the sixteen months between her disclosures and settlement amounts to an unreasonable delay. Powell also criticizes Cherokee's practices with regard to claims handling and educating, training, and evaluating its adjusters. In furtherance of her position, Powell hired an expert, Kevin Quinley, who offered an expert report and testimony in support of her bad faith claims.

In accordance with the Sixth Circuit's mandate, the Court now revisits Cherokee's Motion for Summary Judgment in light of *Phelps*.

## STANDARD

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir.

1996). The plaintiff must present more than a mere scintilla of evidence in support of her position; she must present evidence on which the trier of fact could reasonably find for her. *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Mere speculation will not suffice to defeat a motion for summary judgment: "[T]he mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Still, "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

Finally, while the substantive law of Kentucky is applicable here pursuant to *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938), a federal court sitting in diversity applies the standards of Fed. R. Civ. P. 56, not "Kentucky's summary judgment standard as expressed in *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W2d 476 (Ky. 1991)." *Gafford v. Gen. Elec. Co.*, 997 F.2d 150, 165 (6th Cir. 1993), *abrogated on other grounds by Hertz Corp. v. Friend*, 130 S. Ct. 1181 (2010).

DISCUSSION

**I.    Bad Faith Claims Under Kentucky Law**

Generally, the Kentucky UCSPA, Ky. Rev. Stat. § 304.12-230, "is intended 'to protect the public from unfair trade practices and fraud' and 'imposes what is generally known as the duty of good faith and fair dealing owed by an insurer to an insured.'" *Phelps*, 680 F.3d at 731 (internal citations omitted) (quoting *State Farm Mut. Auto. Ins. Co. v. Reeder*, 763 S.W.2d 116, 118 (Ky. 1988); *Knotts v. Zurich Ins. Co.*, 197 S.W.3d 512, 515 (Ky. 2006)).  An insurer's violation of the UCSPA creates a cause of action both for the insured as well as for those who have claims against the insureds, and the same standard applies in both types of cases.  *Id.* (citing *Motorists Mut. Ins. Co. v. Glass*, 996 S.W.2d 437, 454 (Ky. 1999)).

In order to state a claim under the UCSPA, a plaintiff "must meet a high threshold standard that requires evidence of 'intentional misconduct or reckless disregard of the rights of an insured or a claimant' by the insurance company that would support an award of punitive damages."  *Id.* (quoting *Wittmer v. Jones*, 864 S.W. 2d 864, 890 (Ky. 1993)); *see also United Servs. Auto. Ass'n v. Bult*, 183 S.W.3d 181, 186 (Ky. Ct. App. 2003) (describing the requisite threshold as "high indeed").  In *Wittmer v. Jones*, the Kentucky Supreme Court specifically described the standard as that of "outrageous" conduct by the insurer.  864 S.W.2d at 890.  Once a plaintiff has met this initial showing, she must establish three elements to maintain a claim of bad faith:

> (1) the insurer must be obligated to pay the claim under the terms of the policy; (2) the insurer must lack a reasonable basis in law or fact for denying the claim; and (3) it must be shown that the insurer either knew there was no reasonable basis for denying the

claim or acted with reckless disregard for whether such a basis existed.

*Id.*; *accord Phelps*, 680 F.3d at 731; *Glass*, 996 S.W.2d at 452.

## II.  The Sixth Circuit's Decision in *Phelps*

In the Sixth Circuit's May 2012 decision in *Phelps*, the court began by noting that "the second and third elements of this test depend on evidence similar to the threshold inquiry."  680 F.3d at 731.  The *Phelps* court went on to quote a 2000 opinion by the Kentucky Supreme Court, *Farmland Mut. Ins. Co. v. Johnson*, 36 S.W.3d 368, 376 (Ky. 2000), which stated:  "The appropriate inquiry is whether there is sufficient evidence from which reasonable jurors could conclude that in the investigation, evaluation, and processing of the claim, the insurer acted unreasonable and either knew or was conscious of the fact that its conduct was unreasonable."  680 F.3d at 732.  The Sixth Circuit found it confusing that the Kentucky Court in *Farmland* spoke of a "lower standard of 'unreasonableness'" that will obviously be met if a plaintiff "has first met *Wittmer*'s higher standard of 'reckless disregard.'"  *Id.* at 733. But ultimately, the Sixth Circuit concluded that under Kentucky law a plaintiff still "has to meet *Wittmer*'s higher threshold standard."  *Id.*

The *Phelps* court's confusion on this point is understandable.  But a rereading of *Farmland* in light of *Phelps* informs the conclusion that the Kentucky Court did not intend to supplant *Wittmer*'s threshold inquiry with a lower standard of "unreasonableness." *See Phelps*, 680 F.3d at 732 ("We acknowledge that the Kentucky cases still recognize *Wittmer*'s punitive-damages standard . . . .").  The *Phelps* court's quoted language from *Farmland* appears in that case as a direct quote from the Supreme

Court of Arizona and in the context of analyzing the second element of *Wittmer*'s three-part test. *See Farmland*, 36 S.W.3d at 375-76 (quoting *Zilisch v. State Farm Mut. Auto. Ins. Co.*, 995 P.2d 276, 280 (Ariz. 2000)).  More specifically, the Kentucky Court relied on the Arizona Court's decision solely to support its conclusion that "although elements of a claim may be 'fairly debatable,' an insurer must debate them fairly"; that is, "an insurer is not thereby relieved from its duty to comply with the mandates of the [Kentucky] UCSPA."  *Id.* at 375.  The Kentucky Court's discussion in this regard was not aimed at the *Wittmer* threshold inquiry, but rather to clarify that because a claim may be fairly debatable does not absolve an insurer of the duty to debate it fairly and in accordance with the UCSPA.  *See id.*

In the Sixth Circuit's even more recent unpublished decision in *Nat'l Surety Corp. v. Hartford Cas. Ins. Co.*, the court, applying the Kentucky cases of *Wittmer* and *Bult*, and quoting cases from this District and the Eastern District of Kentucky, held:

> Kentucky's standard is high. . . . Bad faith "is not simply bad judgment.  It is not merely negligence.  It imports a dishonest purpose of some moral obliquity.  It implies conscious doing of wrong. . . . It partakes of the nature of fraud."
>
> The Kentucky Court of Appeals reaffirmed the high evidentiary threshold in bad faith actions against insurers in [*Bult*].  *Bult* identified *Wittmer* as the definitive case governing bad faith actions, and noted that for a bad faith claim to proceed to a jury, evidence sufficient to support an award of punitive damages against the insurer must exist.  The "[e]vidence must demonstrate that an insurer has engaged in outrageous conduct toward its insured. . . ."  "Absent such evidence of egregious behavior, the tort claim predicated on bad faith may not proceed to a jury."

2012 WL 4839767, at *3 (6th Cir. Oct. 9, 2012) (internal citations omitted) (quoting *Bult*, 183 S.W.3d at186; *Matt v. Liberty Mut. Ins. Co.*, 798 F. Supp. 429, 433-34 (W.D. Ky. 1991), *aff'd*, 968 F.2d 1215 (6th Cir. 1992); *Winburn v. Liberty Mut. Ins. Co.*, 8 F. Supp. 2d 644, 647 (E.D. Ky. 1998)).  The parties here disagree over *Nat'l Surety*'s applicability to this case and its effect (or lack thereof) on *Phelps*.  Although it is certainly true that a subsequent panel cannot overrule the *Phelps* panel's published opinion, the Court does not read *Nat'l Surety* as attempting to overrule or even necessarily conflicting with *Phelps* on the fundamental issue of whether *Wittmer*'s high threshold standard applies.

Ultimately, the *Phelps* court expressly acknowledged the vitality of *Wittmer*'s high threshold standard.  680 F.3d at 733.  And, after concluding that a reasonable jury could find that the *Phelps* plaintiff had satisfied *Wittmer*'s threshold inquiry, the *Phelps* court proceeded to address whether she had presented sufficient evidence to raise a genuine factual dispute and thus stave off summary judgment.  *See id.* at 733-35.  The *Nat'l Surety* decision differed insofar as it relied primarily on *Wittmer* and *Bult* (rather than *Farmland* [4]) to find that the plaintiff had failed to satisfy *Wittmer*'s "high evidentiary threshold."  2012 WL 4839767, at *3-4.  But ultimately, both *Phelps* and *Nat'l Surety* continued to apply *Wittmer*'s high threshold standard—a position that is consistent with recent Kentucky decisions and the controlling law in Kentucky courts.  Therefore, the Court does not read *Nat'l Surety* as incongruous with *Phelps* and, in light of those recent Sixth Circuit decisions and the Kentucky caselaw they apply, finds that

---

[4] It is worth noting that *Bult*, which reaffirmed *Wittmer*'s high threshold standard, was decided in 2003, three years after *Farmland*.

*Wittmer*'s threshold requirement remains the relevant controlling inquiry for bad faith claims under Kentucky law.

Therefore, to survive Kentucky's high threshold requirement, Powell must show "evidence of intentional misconduct or reckless disregard of [her] rights by the insurance company that would support an award of punitive damages." *Phelps*, 680 F.3d at 731 (internal quotation marks omitted). Stated differently, she must show: "proof of bad faith . . . sufficient for the jury to conclude that there was 'conduct that is *outrageous*, because of the *defendant's evil motive* or his *reckless indifference* to [her] rights . . . . This means there must be sufficient evidence of *intentional misconduct or reckless disregard of the rights of an insured or a claimant to warrant submitting the right to award punitive damages to the jury*." *Bult*, 183 S.W.3d at 186 (emphasis in original) (quoting *Wittmer*, 864 S.W.2d at 890). As the Kentucky Court of Appeals stated in *Bult*,

> The evidentiary threshold is high indeed. Evidence must demonstrate that an insurer has engaged in outrageous conduct toward its insured. Furthermore, the conduct must be driven by evil motives or by an indifference to its insureds' rights. Absent such evidence of egregious behavior, the tort claim predicated on bad faith may not proceed to a jury. Evidence of mere negligence or failure to pay a claim in timely fashion will not suffice to support a claim for bad faith. Inadvertence, sloppiness, or tardiness will not suffice; instead, the element of malice or flagrant malfeasance must be shown.

*Id.*

As this Court found previously, Powell has made no such showing here.

### III.   *Phelps'* Application to the Instant Case

In *Phelps*, the Court pointed to five issues it found sufficient to raise a genuine factual dispute and thus, presumably, to satisfy the high Kentucky threshold standard. First, the insurer in *Phelps* made a "lowball" offer at the low end of both its own evaluation of the claim and the claimant's documented costs, which failed to reasonably account for either the claimant's pain and suffering or future wage loss.  680 F.3d at 733.  Second, the court found "general evidence of delay tactics" and "questionable delays" in processing the claim, which raised triable issues of whether the insurer "exhibited bad faith i[n] the extensive delay of nearly three years."  *Id.* at 733-34. Third, the insurer refused to disclose its policy limits.  *Id.* at 734.  Fourth, the court found "some evidence of troubling claims-handling practices by [the insurer] both in this case and in general," which included switching adjusters without explanation, habitually making lowball offers, refusing to increase offers without additional documentation, and failing to include facts in its claims file that would support a jury verdict in the claimant's favor.  *Id.* at 735.  And fifth, the court took issue with the district court's failure to consider the claimant's two expert witnesses, whose opinions "raise[d] a genuine dispute as to [the insurer's] compliance with the UCSPA."  *Id.*

The first and third issues—making a lowball offer and refusing to disclose policy limits—do not appear applicable here.  Powell devotes roughly one third of her response to analogizing the facts of her case to those in *Phelps*, many of which were irrelevant to the *Phelps* court's decision.  Regardless, the Court finds the remaining issues identified in *Phelps* factually distinguishable from the circumstances of Powell's case.

### A. Delay

For one, the delay between accident and payment was not unreasonable in this case, and there is no indication whatsoever of the sort of "intentional [or] outrageous conduct . . . driven by evil motives or by an indifference to its insureds' rights" as required by Kentucky law. *Bult*, 183 S.W.3d at 186 (applying *Wittmer*, 864 S.W.2d at 890). As this Court previously recognized, although it took roughly five years to settle her claim, Powell did not submit the first documentation of her physical and economic damages until some *three-and-a-half years* after the accident. *See Wittmer*, 864 S.W.2d at 892 ("The insurer['s] . . . legal responsibility is limited to payment upon proof of loss."). Accordingly, the appropriate moment to begin measuring delay is May 13, 2008, when Powell first responded to Cherokee's interrogatories.[5] Although Powell's objections to the length of the underlying lawsuit are understandable, Cherokee cannot be faulted for failing to settle or make an offer before it was in possession of these answers. These interrogatories were sent one month after Powell filed suit. (In fact, claims adjuster Clement's original requests were sent even earlier, just after the accident occurred.) But Powell did not respond immediately; instead, she waited some three-and-a-half years after the accident to provide Cherokee any documentation. Powell

---

[5] To quote a footnote from the Court's initial ruling on summary judgment:

> It is important to remember that in advance of Powell filing suit in November 2006, [claims adjuster] Clement had written Schaaf on several different occasions asking for his client's medical records. Schaaf and Powell did not abide by these requests however, waiting to release the records until May of 2008. Such evidence directly contradicts Powell's contentions that during this period Cherokee and its agents were neglecting her claim.

(Docket No. 83, at 12 n.3 (internal citations omitted).)

may be correct that liability for the accident was never truly in doubt, but the severity of her injuries from the accident would have been a complete mystery to Cherokee until it received her May 2008 responses.[6]  The record here shows that Cherokee did attempt to make a prompt settlement and wasted no time in starting its investigation, first by writing to Powell and Schaaf to request documentation and then by propounding discovery requests on Powell in an attempt to learn something about her claim.  Thus, it was Powell's delay—not Cherokee's—that stalled the processing of her claim until mid-2008.

From the time Cherokee received Powell's responses until the date a settlement was reached, approximately sixteen months elapsed.  The record reflects that this delay primarily centered on Cherokee's need to depose Powell.  The Court finds that this need was reasonable in light of the fact that her damage claim exceeded $1,200,000 and because a considerable portion of this figure was speculative or unsupported by documentary evidence.  The Court, therefore, again disagrees with Powell's contention that Cherokee possessed all the information it needed to construct a reasonable settlement offer after her May 2008 disclosures.  As the Court previously found, the next logical step in this process was to depose Powell to confirm her alleged damages.  Particularly in light of the scant documentation for a sizeable portion of her claim, the Court believes it was altogether proper and reasonable that Cherokee would need to depose Powell to better assess her damages before making an offer to settle.

_____

[6] As the Court previously noted, even with her May 2008 responses: "With regard to at least two of Powell's claims, her lost wages and future impairment of earning, it is relatively clear that the damages cited in answers to Cherokee's interrogatories were almost entirely speculative." (Docket No. 83, at 13 n.5.)

Furthermore, the record illustrates that between May 2008 and Powell's deposition in March 2009 much of the delay was due to scheduling conflicts—not Cherokee's scheme to deceive or delay. The timeline of the deposition scheduling also illustrates that attorneys Moore and Schaaf acted with professional courtesy toward one another and diligently worked to handle the discovery schedule in an agreeable manner. Accordingly, the record simply does not indicate or suggest the sort of "intentional [or] outrageous conduct . . . driven by evil motives or by an indifference to its insureds' rights" that is required by Kentucky law. *Bult*, 183 S.W.3d at 186 (applying *Wittmer*, 864 S.W.2d at 890).

And finally, the Court finds the delay between Powell's March 2009 deposition and settlement in September 2009 was also not unreasonable. The only significant event during this time appears to be a discussion between Schaaf and Moore about the appropriate path to resolution. Schaaf wrote to Moore in May 2009 offering to settle for $475,000. (*See* Docket No. 34-5.) Within thirty days, the parties had agreed to mediate the claim in September. Schaaf's own notes about a June 2009 conversation with Moore reflect Schaaf's position that although an offer by Cherokee prior to the mediation might be helpful, it was not necessary. (*See* Docket No. 34-6.) With this in mind, it is impossible to characterize Cherokee's behavior between March and September 2009 as unreasonable, much less indicative of bad faith. Cherokee timely responded to Schaaf's settlement offer, and the parties amenably agreed to mediation a few months later. Cherokee's decision not to tender a counteroffer was expressly

condoned by Schaaf.  Thus, the Court finds no evidence that Cherokee's conduct was improper, let alone suggestive of bad faith, between May 2008 and September 2009.[7]

### B.  Claims-Handling Practices & Expert Testimony

In regard to the fourth and fifth issues addressed by the court in *Phelps*—"troubling claims-handling practices" and expert testimony thereof—the *Phelps* court took issue with certain conduct by the insurer such as switching adjusters without explanation, habitually making lowball offers, refusing to increase offers without additional documentation, and failing to include facts in its claims file that would support a jury verdict in the claimant's favor.  680 F.3d. at 735.  Powell summarily argues (by inserting her name in place of the *Phelps* claimant in the court of appeals' decision) that these practices are present here too.[8]  (*See* Docket No. 102, at 18.) Powell also faults Cherokee's internal policies and procedures, including its training and evaluation of claims adjusters, as indicative of "troubling claims-handling procedures." But much of this argument actually goes to her position that Cherokee unduly delayed or failed to promptly investigate her claim.  Even if Cherokee's internal processes are less than perfect (or even seriously flawed), based on its foregoing analysis in Part

---

[7] To the extent not set forth here, the Court further adopts its prior reasoning regarding the issue of delay from its original Memorandum Opinion, (Docket No. 83, at 11-20), and its Order on reconsideration, (Docket No. 91, at 6-8).

[8] Powell cites no evidence of record to support these statements.  Although the Court must resolve all ambiguities and draw all reasonable inferences in Powell's favor, "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute."  Fed. R. Civ. P. 56(c)(1).

III.A, the Court again finds no evidence that Cherokee unreasonably delayed or failed to promptly investigate Powell's claim.

In support of her position, Powell has offered the expert testimony of Kevin Quinley to help demonstrate that Cherokee's actions constitute bad faith.  As it did before in ruling on Cherokee's original motion for summary judgment, the Court again has carefully reviewed and considered both Quinley's expert report and deposition testimony.[9]  (*See* Docket No. 83, at 20 (citing Docket Nos. 34-7, 34-9).)  But, as the Court previously concluded, Quinley's testimony "cannot change the immutable finding of this Court when it reviews the offered proof in the light most favorable to Powell: there is no evidence that 'reveals some act of conscious wrongdoing or recklessness on the part of the insurer.'"  (Docket No. 83, at 22 (quoting *Winner v. State Farm Ins. Co.*, 2006 WL 2792399, at *2 (W.D. Ky. Sept. 25, 2006); *Matt*, 798 F. Supp. at 434).)  While Quinley's report and testimony may indicate areas in which Cherokee can improve its claims practices, that evidence nonetheless falls short of providing a foundation upon which a jury could premise a finding of bad faith.[10]  And even assuming that Quinley's testimony is sufficient to show violations of certain provisions of the UCSPA, Powell

---

[9] The Court further adopts and incorporates by reference its discussion of expert witness Quinley from its original Memorandum Opinion, (Docket No. 83, at 20-23), and Order on reconsideration, (Docket No. 91, at 7-8).

[10] As previously noted in the Court's Memorandum Opinion, (Docket No. 83, at 21-22), the submission of an expert's report or deposition testimony will not necessarily defeat a motion for summary judgment. *See Williams v. Ford Motor Co.*, 187 F.3d 533, 543 (6th Cir. 1999) ("Although expert testimony may be more inferential than that of fact witnesses, in order to defeat a motion for summary judgment an expert opinion must be more than a conclusory assertion about ultimate legal issues.")  A number of courts applying Kentucky's bad faith law have seen fit to grant summary judgment or directed verdict motions notwithstanding a plaintiff's expert testimony. *See, e.g.*, *Scott v. Deerbrook Ins. Co.*, 714 F. Supp. 2d 670, 680-81 (E.D. Ky. 2010); *Bult*, 183 S.W.3d at 186.

must still satisfy the Kentucky threshold standard set forth in *Wittmer* and since followed by both Kentucky and federal courts applying Kentucky law. Powell has not satisfied this standard, and nothing in Quinley's testimony establishes otherwise.[11]

And, finally, unlike the facts of *Phelps* where the district court failed to consider the claimant's proffered expert testimony, this Court has expressly considered Powell's expert evidence in its original Memorandum Opinion granting summary judgment, (Docket No. 83), its subsequent Order on reconsideration, (Docket No. 91), and in the instant Opinion as well. In the aggregate, Powell simply has failed to put forth evidence sufficient to satisfy Kentucky's threshold standard for her bad faith claim. *See Bult*, 183 S.W.3d at 186 ("Absent such evidence of egregious behavior, the tort claim predicated on bad faith may not proceed to a jury."). As such, summary judgment remains appropriate.

## CONCLUSION

For these reasons, much, if not all, of the Court's prior reasoning in granting summary judgment remains proper in light of *Phelps* and under existing Kentucky law. Accordingly, the Court again will grant Cherokee summary judgment on Powell's bad faith claims. An appropriate order will issue contemporaneous to this Opinion.

Date:

cc: Counsel

---

[11] In fact, Quinley expressly refused to opine whether Cherokee's conduct exhibited "reckless indifference to [Powell's] rights" or whether Cherokee acted with malice or an "evil motive." (*See* Docket No. 34-9, at 31; *see also* Docket No. 83, at 21.)